**BOWLES, Administrator, O. P. A., v.
LEVENTHAL.**

District Court, S. D. New York.
March 28, 1945.

Paul L. Ross, Regional Enforcement Executive, and Callman Gottesman, Chief Enforcement Atty., both of New York City (William F. Cauley, Jr., of Yonkers, N. Y., of counsel), for plaintiff.

Benjamin E. Alter, of New York City (Irving J. Roth, of New York City, of counsel), for defendant.

KNOX, District Judge.

For several years prior to 1941, defendant was engaged in selling merchandise at retail upon installments of "dollar down and a dollar a week." In so doing, he charged full list prices and a little extra because of risks involved in that type of business. In November of the latter year, and due to war conditions, he decided to go into the discount business and sell standard articles below competitive prices. His operations consist principally in dispensing jewelry, clothing, toilet articles and personal items, to retail purchaser who, according to defendant, can supply their wants at discounts of from 20 to 25 percent below list prices. This, it is said, is due to the fact that defendant carries on business on

the sixth floor of an office building, and is put to little expense for sales service and advertising. His gross sales amount to about $80,000 per annum.

On August 16, 1943, defendant sold and shipped to Randolph J. Seidenberg, at Buffalo, N. Y., 144 Regens mechanical cigar or cigarette lighters and charged therefor the sum of $2.75 each. On September 14, 1943, he sold 432 of the same type of lighters to Seidenberg at a price of $3. each. Two weeks thereafter, defendant sold 360 Regens lighters, with nickel cases, to Stanley A. Levy, also of Buffalo, at $3 per item. On October 13, 1943, he sold Levy 190 additional lighters at $3.75 each, and a week later sold him 216 more lighters at the same price. The lighters were purchased by Seidenberg and Levy with the intention of retailing them at $4.95 apiece.

The items here involved were manufactured by the Regens Lighter Corporation in Long Island City, and plaintiff called Rudolf Dismas, vice president of that organization, as a witness. According to him, the prices at which his corporation sold lighters after March, 1942, as of which time prices generally were frozen, were $5.40 per dozen to jobbers; $7.20 to retailers, and the latter were supposed to supply the users of the items at $1 apiece. The manufacturer advertised its wares in the October issues of two local trade publications, known as "The Tobacco Jobber" and "The Retail Tobacconist," respectively, and specifically declared that the retail price of the lighter was unchanged at $1 each. Letters and price sheets to the same effect, and of earlier dates, were widely distributed throughout the trade. The corporation endeavored to sell its product only to merchants who maintained its price list.

Subsequent to March, 1942, the company had but two domestic competitors, and each of them sold its lighters at prices less than those charged by the Regens Company. Dismas, however, stated that he could not, in all instances, quote jobber's prices for lighters after March, 1942, because of the existence of a black market in the trade.

Section 1499.2 of the General Maximum Price Regulation sets the maximum price of an article offered for sale at "the highest price charged by the seller during March, 1942, for the same commodity" or "for the similar commodity most nearly like it" or at the highest price charged during March, 1942, by the "most closely competitive seller of the same class for the same commodity."

The testimony of Dismas was offered by plaintiff in order to prove the ceiling prices on Regens lighters that had been established by defendant's "most closely competitive seller," which price, in the absence of a price established by defendant in March, 1942, would tend to place a limitation on the amount he might charge for the same item. While there is no direct showing that defendant saw or knew of any of the advertising matter issued by Regens Lighter Corporation, it is reasonable to suppose that defendant, as an experienced trader, when he undertook to deal in Regens lighters, would inform himself of what the company charged for the merchandise he was handling. For him to have done so would seem to be a natural course of procedure in the business in which he was engaged. He, the same as every trader, was charged with knowledge of the price regulations of the Administrator, and it became his duty to inform himself of the restrictions applicable to his line of business. For this reason, it is fair to assume that he either knew or should have known that the ceiling prices of Regens Lighter Corporation were also prices by which he might be bound. If I am correct in this, Leventhal must bear the burden of showing that his established ceiling price in March, 1942, if he had had one) differed from that of the manufacturer of the Regens lighter.

Leventhal, it appears, purchased the lighters in question from a man named Philip Applebaum, who has a place of business at 598 Seventh Avenue, New York. He is a customer of defendant, and from time to time purchases shirts and socks at Leventhal's shop. On one of his visits to defendant's store, Applebaum showed Leventhal a Regens lighter, and, on the latter's inquiry, told him that he could supply the article at $32 per dozen. Thereupon, defendant asked the retail selling price of the article, and was informed that "in the window downstairs, there is a sign displaying them at $4.95. Leventhal then requested Applebaum to leave with him six lighters, and this was done.

Some time later, Leventhal was playing golf with David Schoolman, and, as they walked about the course, the two men discussed business matters in which they had a common interest. Schoolman, who is an accountant, called attention to the fact that Randolph J. Seidenberg was one of his clients, and on being apprised of the wide

variety of the lines of goods handled by Leventhal, Schoolman said: "Maybe you can pick up some lighters. This client of mine, Seidenberg, is a big distributor and a retail man in Buffalo wanted some lighters." Leventhal replied: "Well, there is a fellow left some stuff up in my place. Let him (Seidenberg) come and look at it." Some days later a man who turned out to be Seidenberg called on Leventhal and said, "Mr. David Schoolman sent me here." Thereupon, Leventhal showed him a Regens lighter, and was then asked "What price is it?" Leventhal replied, "Well, we had set a price (retail) of $4.95 on it." His explanation as to the manner by which he and Seidenberg agreed on a price of $2.75 for the first shipment is this: "Well, when he came up and he asked me the price of them and I figured we were selling them for $4.95 or $5. and on a job batch, which occasionally I had, we gave a little added discount as long as I could make a little money, and figured about 20 to 25 off, which was my customary job lot price, would bring it to $48. When I asked him that price, he says, 'That is out of the question because they want to sell it for $4.95 and the profit wasn't there,' and I said, 'All right, I will make a small turnover and I will ask for $36.' and he said '$3.,' and I said, 'All right. Send me something as soon as you can.'"

Aside from the six lighters that had been left with him by Applebaum, Leventhal then had no lighters in stock. However, he called Applebaum and asked if he could procure four gross of the lighters. Thereafter, the same were delivered to Leventhal, who gave him a check to Applebaum for $1,440. After describing the circumstances under which he sold Regens lighters to Levy, the following colloquy took place between Leventhal and the Court:

"Q. When you made this sale to this merchant up in Buffalo, did you make any inquiry as to what the retail price was under the O.P.A. regulation? A. My feeling was $4.95.

"Q. Did you make any inquiry? A. Yes. That lighter, about five stores around my neighborhood were selling that lighter for $4.95. One was Herman's at 420 West 42nd Street. He had a sign in his window.

"Q. Even if that is true, did you make any inquiry as to what the price was in 1942 at which these Buffalo merchants sold? A. Well, Mr. Seidenberg is a cigar man and he has been in business so long.

"Q. You are not answering my question. I am asking you whether you made any inquiry as to the price at which he might legitimately sell those lighters? A. I don't get that question.

"Q. Let us say that you knew that all he could get for the lighters was a dollar under the price regulation. Was anything said by you or by him at the time you negotiated this purchase as to what the O.P.A. price was? A. No, nothing at all. In that respect, Mr. Seidenberg said he would like to sell these lighters for $4.95."

At this point, defendant's attorney interjected and inquired:

"Q. Mr. Leventhal, did you know that you could only sell this lighter for a dollar? A. No, I did not. I never heard of the lighter before.

"Q. In other words, you based your price of this lighter on what you considered to be similar to what you sold in March, 1942? A. That is right.

"Q. You knew of no lighter that retailed for a dollar? A. I did not know of any price. I never heard of that lighter before."

Leventhal then proceeded to say that in 1942, he paid from $4 or $5 each for a "Ronson" lighter, but that articles comparable with the Regens product were costing about $36 per dozen. The names of such lighters, however, were not given. Leventhal also said that when he first talked with Applebaum about purchasing Regens lighters, he asked one of his employees to get out his March, 1942, price sheets, from which he ascertained that he was then selling a "press" lighter at $5, a lipstick lighter at $0.79 and a "Ball of Flame" at $0.98. These sheets, however, do not disclose the name of the manufacturer of the lighter for which Leventhal had then charged $5. It is, therefore, impossible to say if it was a commodity most nearly like the Regens device.

Notwithstanding that the General Maximum Price Regulation required defendant to prepare on or before July 1, 1942, and thereafter keep for examination, a base period statement showing the highest price that he charged for commodities delivered in March, 1942, together with his offering prices for delivery of the same during that month, together with an appropriate identification of each such commodity, and all customary allowances, discounts and other price differentials, he did not do so.

Another regulation required Leventhal to prepare current pricing records showing as precisely as possible the bases on which he determined maximum prices for all articles not identical with those on the base period statement. Here, again, defendant did not voluntarily comply. By an order of this court, dated July 6, 1944, he was directed to prepare a base period statement and a current pricing record as called for by the regulations. This, he purported to do, and the document allegedly showing such data is before the court as plaintiff's exhibit 20. Item 15 thereof reads:

he saw in 1943 in other stores cannot serve as a defense for his own wrongful conduct, or his gross negligence.

Similarly, the effort made to justify his conduct by the alleged sale of a lighter similar to that of Regens, in March, 1942, is unconvincing. The duplicate sales slip purporting to show the transaction does not identify the type of lighter that was sold. Certainly, it was not one made by the Regens Company, and defendant's statement that the one sold was similar thereto is far from persuasive. His explanation is that when he changed his method of doing busi-

| Base Item | Item | Supplier's name | Description | Highest Price March 1942 | Invoice No. 79874 |
|---|---|---|---|---|---|
| 15 | Lighter cig | Cash job lot | | $4.95 | |

Date of Invoice
3/17/42

So far as this exhibit goes, it does not indicate that in March of 1942 defendant sold any cigar lighters at jobber's prices, and his current pricing statement omits any mention of sales of Regens lighters. Notwithstanding all this, Leventhal's jobbing prices to Seidenberg and to Levy, within a period of less than three months, running from August 16, 1943 to October 22, 1943, ranged from $2.75 to $3.75 per lighter.

■ In order to substantiate his statement to the effect that lighters similar to those of Regens' manufacture were selling at $3.44 at a time prior to the date of trial, Leventhal produced and offered in evidence a lighter that was manufactured in Canada, and imported into the United States. Such importation was subject to a tariff of 110%, and the same is now being sold under Special Order No. 41 of the Office of Price Administration. Under these circumstances, the Canadian lighter cannot be regarded as being similar to the Regens product, and its current price is immaterial.

■ When Leventhal was asked directly if in the ordinary course of business he would make inquiry as to the price at which he could purchase lighters for manufacturers, he said: "In the ordinary course of business I would say yes and no, but knowing that I saw that lighter (Regens) sold for $4.95, I know I never bought it any cheaper than 50 off. I saw the lighter for $4.95 in quite a few places." Granting this to be true, defendant did not inquire at what price these concerns were selling similar lighters in March, 1942, and what

ness from an installment to a trade discount basis, he had 20 to 30 lighters on hand, and the sale in question consisted in disposing of one of these. What became of the others is not disclosed. Furthermore, defendant could not name the lighter, and the description of it was so vague that no reliance can be placed upon his statement that it was similar to the Regens device.

Cigar lighters vary in price as a result of the metal of which they are made, the fineness of the workmanship that is in them, the nature of their construction and method of operation, together with their sparking mechanism. Notwithstanding, the only similarity between the lighter that defendant sold in March, 1942, and the Regens lighter that he could point out, was that both had a similar sparking mechanism. He even admitted that the lighter he sold might possibly have been gold plated since it had a yellowish finish.

■ From all that has been said, I am satisfied that during the base period of March, 1942, he did not sell a lighter similar to the Regens product, and had, therefore, no established ceiling that would justify the prices at which he sold lighters to Seidenberg and Levy.

Some time after defendant sold Regens lighters to Levy, the latter discovered that under O.P.A. regulations he could not lawfully sell them at a price of more than $1 each. Thereupon, Levy returned to Leventhal 19 or 20 lighters that remained unsold out of the first shipment, together with the entire shipment of 216 lighters, and re-

ceived from defendant the sum that had been paid therefor. By reason of this, defendant contends that under Section 205(e) of the Emergency Price Control Act of 1942, as amended by Section 108(b) of the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix, § 925, he can not be held liable for treble damages with respect to the sales so rescinded. In other words, the argument is that the rescission wiped out any "overcharge" that may have been exacted when the sale was made.

■ With this contention, I can not agree. Neither Seidenberg nor Levy, who purchased lighters from Leventhal, was qualified under the provisions of Section 205(e) of Price Control Act, as originally written, or as amended June 30, 1944, to bring an action against the defendant. This is so for the reason that their purchases of lighters were in the course of trade or business. Under such circumstances, the Administrator, and he alone, is authorized to make recovery of such overcharges (together with penalties), as were paid defendant. And where the overcharges were wilfully made, or are the result of failure to take practicable precautions against the occurrence of the violation (and Leventhal's violations were of that character), the Administrator is entitled to recover such sums as might be assessed against defendant by a buyer who was qualified to bring suit against the seller. In such cases, the plaintiff's measure of recovery consists of a reasonable attorney's fee and costs, as determined by the court, "plus whichever of the following sums is the greater, (1) Such amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based, as the court in its discretion may determine, or (2) an amount not less than $25., nor more than $50., as the court in its discretion may determine: Provided, however,— That such amount shall be the amount of the overcharge or overcharges or $25., whichever is greater, if the defendant proves that the violation of the regulation, order, or price schedule in question was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation."

If defendant's argument to the effect that plaintiff cannot recover with respect to overcharges on the sales to Levy that he and Leventhal rescinded, be sound, it would place the rights of the Administrator at the mercy of black market sellers and buyers, and they would be enabled, in some cases, utterly to frustrate the remedial purposes of the statute. For example, let it be supposed that in a period of scarcity of alcoholic beverages, a dealer should sell 1,000 cases of whiskey to a purchaser at a price of $50 per case above the ceiling price of that commodity, and that only the Administrator was vested with authority to sue the seller for the overcharges and penalties. Potentially, he would be entitled to recover the sum of $150,000. Let it then be further supposed that, subsequent to the time at which the Administrator learned of the transaction, but before he instituted suit against the seller, both he and the purchaser, having become aware that their illegal acts had been discovered, it would indeed be anomalous if the seller could escape liability for his wrong, by arranging with his purchaser to undo their unlawful acts. A thief who steals his employer's funds, and who returns them to the till, upon discovery of his theft, cannot thus wipe out his crime. Neither can this defendant and one of his black market purchasers, through a rescission of their unlawful contract, put at naught the rights of the Administrator.

■ The further contention of the defendant that the Administrator cannot sue for treble damages where the purchase was in the course of trade or business, and not to a consumer, is clearly untenable in view of the wording of the statute. Bowles v. Chew, D.C., 53 F.Supp. 787, 790.

■ Furthermore, defendant's objection to the amendment of the complaint at the time of trial, so as to include the sale of lighters, that was made to Seidenberg on August 16, 1943, is without merit. Defendant interposed no special defense to the allegations that such sale took place at prices above the ceiling, with the exception that action thereon is said to be barred by the statute of limitations; that is to say, that more than one year elapsed between the date of sale and the amendment of the complaint. The complaint itself was filed on June 6, 1944, which date, of course, was less than one year subsequent to the sale. This matter, it seems to me, is fully covered by subdivision (b) and (c) of Rule 15 of the Supreme Court Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Subdivision (b) reads, in part: "If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the

pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence." (no request for a continuance was here made)

Subdivision (c) of Civil Rule 15 is in these words: "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Paragraph 9 of the complaint, so far as here material reads: "Since about August 1, 1943 to the date of this complaint, (June 2, 1944), defendant has sold and delivered cigarette lighters to R. J. Seidenberg Company, S. L. Levy Inc., Buffalo, New York * * * at prices in excess of the maximum prices established by the General Maximum Price Regulation. * * *"

It is thus clearly seen that plaintiff's amendment of his complaint at the time of trial was altogether permissible by the express terms of Rule 15, subdivision (c).

According to my calculations, the overcharges that defendant made on his sales of lighters to Seidenberg and to Levy amounted, in the aggregate, to $3,381.30. Three times that sum is $10,467.90, and plaintiff may have judgment in that amount.